Filed Under Seal          **SEALED**

**FILED (DROP BOX)**

**NOV 12 2021**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

RECH : SEA1058835

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
TACOMA DIVISION

**21-CV-1542 ᴾᴬᴶ**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **GERARDO COSME,** | ) Civil Action ) No._____ |
| **Relator,** | ) ) |
| v. | ) **COMPLAINT** ) |
| **CENTENE CORPORATION, AMBETTER, INC., and WELLCARE HEALTH PLANS, INC.,** | ) *[JURY TRIAL DEMANDED]* ) ) **FILED UNDER SEAL** ) **PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **Defendants.** | ) **DO NOT PLACE IN PRESS BOX** ) **DO NOT ENTER ON PACER** ) |

*Qui tam* relator, Gerardo Cosme (Relator or Cosme), bring this action against Centene Corporation, Ambetter, Inc., and WellCare Health Plans, Inc. (collectively "Defendants") on behalf of the United States and on his own behalf, alleging violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended (FCA). Based on personal knowledge (unless otherwise indicated), information he uncovered, findings he established, and relevant documents, Relator alleges the following:

COMPLAINT - 1
Civil Action No. _____

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA 98112
TELEPHONE: 206-860-2883

I.    **INTRODUCTION**

1.    Since 2011, health insurance issuers have been required to submit annual reports to the United States Department of Health and Human Services (HHS), detailing the share of premium dollars spent for medical benefits and the share spent for administrative expenses and profits.

2.    In an effort to ensure that taxpayers and enrolled beneficiaries receive value from government healthcare programs, Congress implemented a minimum Medical Loss Ratio (MLR) requirement. In broad terms, the MLR requires that at least 80% of enrollee premiums are spent on medical claims as opposed to other non-claim expenses such as administration, insurance broker fees, or profits.

3.    This case concerns Defendants' fraud against state and federal healthcare programs, including Medicaid, Medicare, and TRICARE. Defendants accomplished their fraud by knowingly submitting or causing to be submitted false claims and false statements in violation of MLR requirements by categorizing and paying insurance brokers, agents, or producers[1] as medical providers. Not only did Defendants submit false statements about how brokers' fees and commissions were paid, and false claims for federal payments related to such false statements, but this conduct inflated Defendants' MLR and, thus, reduced the amount to be remitted to CMS or rebated to policyholders.

4.    In short, Relator learned during the course of his employment with Defendants that they falsely state insurance brokers are "medical providers" and falsely submit costs related to those services as medical claims, rather than properly as non-claim administrative costs. Because of Defendants' fraudulent conduct, the Government has been, and continues to be, harmed.

---

[1] Collectively referred to as "brokers" or "insurance brokers" throughout the Complaint.

COMPLAINT - 2
Civil Action No. _____

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

**II.    JURISDICTION AND VENUE**

5.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court over actions under 31 U.S.C. §§ 3729 and 3730.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because Defendants can be found, transact business, and committed acts proscribed by 31 U.S.C. § 3729 in this District, specifically in Thurston County.

7.      Relator is aware of no statutorily relevant public disclosure of the allegations or transactions in this Complaint. Even if such a disclosure had occurred, Relator is the "original source" of the allegations in this Complaint and meets the requirements of 31 U.S.C. § 3730(e)(4)(B). During his employment with Defendants, Relator acquired material, direct, independent, and non-public knowledge of the information on which the allegations in this Complaint are based, and he voluntarily and in good faith provided this information to the United States Attorney's Office for the Western District of Washington before filing this action.

**III.   THE PARTIES**

     **A.     Plaintiff/Relator**

8.      Relator Gerardo Cosme is a resident of Cobb County, Georgia. He has been a licensed insurance broker for over 20 years. Relator served as an insurance broker for Defendants, through Defendant Ambetter, from October 2015 through his retaliatory termination in October 2021, providing insurance brokerage services for members across the United States.

9.      In addition to proceeding on his own behalf, Relator also brings this action under the FCA on behalf of the United States of America. The United States acts through its various agencies and departments, including HHS, which administers Medicare and Medicaid through the Centers for Medicare and Medicaid Services (CMS).

*COMPLAINT* - 3
*Civil Action No.* _____

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA 98112
TELEPHONE: 206-860-2883

1

    **B.**    **Defendants**

2         10.    Defendant Centene Corporation (Centene) has operated government-sponsored

3 healthcare programs for more than 30 years. Centene offers health insurance products to nearly

4 1-in-15 individuals across the nation, including Medicaid and Medicare members as well as

5 individuals and families served by the Health Insurance Marketplace and TRICARE. Centene

6 owns other healthcare insurance companies, such as Ambetter, Inc.; WellCare Health Plans, Inc.;

7 and Centene Management Company, LLC. Centene, WellCare, and Centene Management

8 Company, LLC all appear in Relator's Form 1099 documentation. Centene is incorporated in

9 Delaware and is headquartered in St. Louis, Missouri, at 7700 Forsyth Boulevard, St. Louis,

10 Missouri 63105. Centene is also incorporated in Washington, with its registered agent located at

11 711 Capitol Way S, Suite 204, Olympia, Washington 98501.

12         11.    Defendant Ambetter, Inc. (Ambetter) is a healthcare insurance company that

13 administrates and sells healthcare insurance plans in 20 different states and on government

14 healthcare exchanges. Ambetter is a subsidiary of Centene. Each state-specific program managed

15 by Ambetter has a state-specific corporation as well. For example, in the state of Washington,

16 Ambetter operates under Coordinated Care of Washington, Inc. (Coordinated Care). According

17 to the Washington Secretary of State, Coordinated Care's principal office address is 550 North

18 Meridian, Suite 101, Tacoma, Washington 98402.

19         12.    Defendant WellCare Health Plans, Inc. (WellCare) is also a health insurance

20 company that provides managed care service through Medicaid, Medicare Advantage, and

21 Medicare prescription drug plans. Centene acquired WellCare in January 2020. WellCare is

22 incorporated in Delaware and is headquartered in Florida at 8735 Henderson Road, Renaissance

23 One, Tampa, Florida 33634.

24

SMITH & LOWNEY PLLC
2317 East John Street
Seattle, WA 98112
Telephone: 206-860-2883

1

## IV.   STATUTORY AND REGULATORY CONTEXT

2

### A.   The False Claims Act

3

13.   This case alleges violations of 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G).

4

14.   The FCA imposes liability on:

5

(1) . . . any person who

6

(A) knowingly presents, or causes to be presented, a false or
fraudulent claim for payment or approval;

7

(B) knowingly makes, uses, or causes to be made or used, a false
record or statement material to a false or fraudulent claim;
. . . is liable to the United States Government. . . .

8

9

(G) knowingly makes, uses, or causes to be made or used, a false
record or statement material to an obligation to pay or transmit
money or property to the Government, or knowingly conceals
or knowingly and improperly avoids or decreases an obligation
to pay or transmit money or property to the Government . . .

10

11

12

31 U.S.C. § 3729(a)(1) (FCA as amended by the Fraud Enforcement and Recovery Act of 2009,

13

Public Law 111-21).

14

15.   The FCA is "the Government's primary litigative tool" for combating fraud.[2] It

15

applies "expansively … 'to reach all types of fraud, without qualification, that might result in

16

financial loss to the Government.'"[3]

17

16.   As defined in the FCA, the terms "knowing" and "knowingly" mean that, with

18

respect to information, a person "(i) has actual knowledge of the information; (ii) acts in

19

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of

20

the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Liability under the FCA

21

requires no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B).

22

23

---

[2] S. Rep. No. 99-345, at 2 (1986).
[3] *Cook Cty. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *U.S. v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

24

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

17.     The FCA further defines the term "claim" to mean any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

18.     The FCA defines the term "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

19.     The FCA defines "material" objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This "natural tendency" test has long been the standard in determining materiality. *See, e.g., United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008). The Supreme Court reaffirmed the natural tendency test and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). In determining whether a false claim or statement is "capable of influencing" the Government's decision-making process, the FCA's materiality standard looks to the effect on the likely or actual behavior of the government recipient of the misrepresentation. *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1019 (9th Cir. 2018), *cert. denied sub nom. Stephens Inst. v. United States ex rel. Rose*, 139 S. Ct. 1464, 203 L. Ed. 2d 684 (2019), *United States v. Lindsey*, 850 F.3d 1009, 1017 (9th Cir. 2017).

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA 98112
TELEPHONE: 206-860-2883

**B.     Medicare Program**

20.     Title XVIII of the Social Security Act (Medicare) is a federally subsidized health insurance system for persons who are eligible based on age (over 65), disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1, 426A.

21.     HHS is responsible for the administration and supervision of the Medicare program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.

22.     CMS contracts with private contractors referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors (MACs) to act as agents in reviewing and paying claims submitted by healthcare providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims for reimbursement.

23.     Medicare is divided into four parts with separate coverage authorities: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare Advantage); and Medicare Part D (prescription drug coverage).

**C.     Medicaid Program**

24.     In 1965, Congress established the Grants to States for Medical Assistance Programs under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-2 (Medicaid). Medicaid provides medical and health-related assistance for society's neediest and most vulnerable individuals. Those eligible for Medicaid include pregnant women, children, and persons who are blind or suffer from other disabilities and who cannot afford the cost of healthcare. 42 U.S.C. § 1396d.

25.     Medicaid is a joint federal-state healthcare program. 42 U.S.C. § 1396b. If a state elects to participate in the program, the costs of Medicaid are shared between the state and the

COMPLAINT - 7
Civil Action No. _____

1  federal government. 42 U.S.C. § 1396a(a)(2). In order to receive federal funding, a participating

2  state must comply with requirements imposed by the Act and regulations promulgated

3  thereunder.

4       26.  Medicaid is administered at the federal level by the Secretary of HHS, through

5  CMS, which promulgates regulations, including minimum coverage parameters and medical loss

6  ratio requirements.

7       27.  Each state has its own Medicaid agency, which is responsible for developing

8  CMS-approved programs, setting its own guidelines regarding eligibility and services, and

9  administering claims.

10       28.  Beginning in 2017, States must ensure that Medicaid programs meet the MLR

11  requirements. 42 C.F.R. § 438.8(a).[4]

12       29.  Medicaid managed care plans, including managed care organizations (MCOs),

13  prepaid ambulatory health plans (PAHPs), and prepaid inpatient health plans (PIHPs) are subject

14  to Federal MLR requirements. 42 C.F.R. § 438.8(a).

15       30.  For Medicaid managed care, States contract with and oversee the health plans that

16  operate in the State. States pay these contracted managed care plans a monthly premium, known

17  as a capitation payment, for each enrollee regardless of whether the enrollee uses any covered

18  services each month. Federal MLR requirements were established to ensure that Medicaid

19  managed care plans spend most of these payments on enrollees' covered services and quality

20  improvements, thereby limiting the amount that plans can spend on administration and keep as

21  profit. 81 Fed. Reg. 27498, 27521.

22

23

---

24  [4] Only nine states did not establish minimum MLR requirements for any plans: Georgia, Texas, Utah, Kansas, Arizona, Tennessee, Wisconsin, New Hampshire, and Rhode Island.

COMPLAINT - 8
Civil Action No. _____

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA 98112
TELEPHONE: 206-860-2883

31.     If required by the State, a managed care plan "must provide a remittance for an MLR reporting year if the MLR for that MLR reporting year does not meet the minimum MLR standard of 85 percent or higher if set by the State as described in 42 C.F.R. § 438.8(c)." 42 C.F.R. § 438.8(j).

32.     A managed care plan's annual MLR report must include specific data elements, such as the calculated MLR, premium revenue, and (if applicable) any remittance amounts owed to the State. 42 C.F.R. § 438.8(k).

### D.      The Patient Protection and Affordable Care Act

33.     The 2010 Patient Protection and Affordable Care Act (ACA) "aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

34.     Payments made by, through, or in connection with an Exchange under the ACA are subject to the FCA if those payments include any Federal funds. 42 U.S.C. § 18033(a)(6)(A).

35.     "Compliance with the requirements of [the ACA] concerning eligibility for a health insurance issuer to participate in the Exchange shall be a material condition of an issuer's entitlement to receive payments, including payments of premium tax credits and cost-sharing reductions, through the Exchange" (emphasis added). *Id.*[5]

36.     The ACA also requires, among other things, certain health insurers to provide remittances if they do not meet a set financial target known as a medical loss ratio (MLR). 42 U.S.C. § 300gg–18(b)(1); 42 U.S.C. § 1395w-27(e)(4)(A).

37.     The MLR requirements are "an integral provision" of the ACA that play "a key role in furthering Congress' plan to decrease health care costs by requiring health insurance

---

[5] An issuer means a health insurance issuer. 45 C.F.R. § 144.103.

*COMPLAINT* - 9
*Civil Action No.* _____

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA   98112
TELEPHONE: 206-860-2883

companies to spend at least 80 percent of their premium income on health care claims and health

quality improvement." *Morris v. California Physicians' Serv.*, 918 F.3d 1011, 1013 (9th Cir.

2019.

38.     Congress included a number of provisions in the ACA designed to ensure the

"financial integrity" of the Exchanges. *See* 42 U.S.C. § 18033. One of these provisions is 42

U.S.C. § 18033(6), which extends federal FCA liability to the Exchanges with enhanced

damages or penalties exposure. This section provides:

> Notwithstanding paragraph (1) of section 3729(a) of title 31, United States Code,
> and subject to paragraph (2) of such section, the civil penalty assessed under the
> False Claims Act on any person found liable under such Act as described in
> subparagraph (A) shall be increased by not less than 3 times and not more than 6
> times the amount of damages which the Government sustains because of the act of
> that person.

### E.     Medical Loss Ratio Requirements

39.     As observed by CMS, "[m]any insurance companies spend a substantial portion of

consumers' premium dollars on administrative costs and profits, including executive salaries,

overhead, and marketing."[6]

40.     Congress imposed the MLR to provide "greater transparency and accountability

around the expenditures made by health insurers and to help bring down the cost of health care."

41.     The purpose of the MLR is to encourage the use of premium income to provide

benefits to insureds and discourage its use to offset administrative costs, thus serving the primary

goal of expanding affordable care. 42 U.S.C. § 300gg-18(b)(2).

42.     Accordingly, under the ACA, beginning not later than January 1, 2011, a health

insurance issuer offering group or individual health insurance coverage *shall* provide remittances

---

[6] https://www.cms.gov/es/node/190956. All websites referenced in this Complaint were last accessed on November
__, 2021.

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

1 | if they do not meet the MLR set financial target. 42 U.S.C. § 300gg-18(b)(1); 42 U.S.C. §

2 | 1395w-27(e)(4)(A).

3 |     43.    The ACA defines the MLR as "the ratio of the incurred loss (or incurred claims)

4 | plus the loss adjustment expense (or change in contract reserves) to earned premiums..." 42

5 | U.S.C. § 300gg–18(a).

6 |     44.    Under the regulations, earned premium means "all monies paid by a policyholder

7 | or subscriber as a condition of receiving coverage from the issuer, including any fees or other

8 | contributions associated with the health plan." 45 C.F.R. § 158.130.

9 |     45.    Health insurance companies, like Defendants, are required to report earned

10 | premium for each MLR reporting year. 45 C.F.R. § 158.110; 45 C.F.R. § 158.130.

11 |     46.    Individual and small group insurance plans must meet an 80% MLR requirement,

12 | while large group plans are required to meet an 85% MLR requirement. 42 U.S.C. § 300gg-

13 | 18(b)(1)(A)(i)-(ii).

14 |     47.    In essence, MLR measures the share of healthcare premium dollars spent on

15 | medical benefits (Healthcare Costs) as opposed to company expenses such as overhead or profits

16 | (Administrative Costs). For example, if an insurer collects $100,000 in premiums and spends

17 | $85,000 on medical care, the MLR is 85%.

18 |     48.    If an MA plan has failed to have an MLR of at least 85%, the MA plan shall remit

19 | to the Secretary an amount equal to the product of the total revenue of the MA plan under this

20 | part of the contract year and the difference between 85% and the medical loss ratio. 42 U.S.C. §

21 | 1395w-27(e)(4)(A).

22 |     49.    Issuing such remittances is not optional for a health insurer in violation of the

23 | MLR requirements. According to CMS, "[i]f an issuer fails to meet the applicable MLR standard

24 |

*COMPLAINT* - 11
*Civil Action No.* _____

1  in any given year, as of 2012, the issuer is *required* to provide a rebate to its customers"

2  (emphasis added).[7]

3      50.     Every year, Defendants are required to submit the Medical Loss Ratio Reporting

4  Form issued by CMS.

5      51.     The Medical Loss Ratio Reporting Form includes the following attestation

6  statement:

7          The officers of this reporting issuer being duly sworn, each attest that he/she is the
           described officer of the reporting issuer, and that this MLR Reporting Form is a full
8          and true statement of all the elements related to the health insurance coverage issued
           for the MLR reporting year stated above, and that the MLR Reporting Form has
9          been completed in accordance with the Department of Health and Human Services
           reporting instructions, according to the best of his/her information, knowledge and
10         belief. Furthermore, the scope of this attestation by the described officer includes
           any related electronic filings and postings for the MLR reporting year stated above,
11         that are required by Department of Health and Human Services under section 2718
           of the Public Health Service Act and implementing regulations.

12

13     52.     According to CMS, the attestation is to be completed by the CEO, COO, the CFO,

    or a designated Chief Compliance Officer who has been approved by CMS to sign Health Plan
14
    Management System (HPMS) attestations.
15
       53.     Issuers, like Defendants, file their MLR reporting form with CMS' online Health
16
    Insurance Oversight System (HIOS). The data uploaded to HIOS will contain a separate
17
    completed Excel template for each issuer in each state in which an issuer has written health
18
    insurance premiums or incurred claims.
19
           **F.      Prohibition on Broker Commissions as Healthcare Costs**
20
       54.     The MLR is intended to ensure that spending is focused on healthcare expenses, as
21
    opposed to administrative costs such as salaries or marketing.
22

23

24  _____

[7] https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/Medical-Loss-Ratio

*COMPLAINT* - 12
*Civil Action No.* _____

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA 98112
TELEPHONE: 206-860-2883

55.     Insurance agents' and brokers' fees and commissions must be counted as Administrative Costs, that is non-claim costs, for purposes of determining the MLR. 45 C.F.R. § 158.160(b)(2)(iv).

56.     The Medical Loss Ratio Reporting Form instructions provided by CMS for use by issuers, like Defendants, designate agent and broker fees and/or commissions as non-claims costs that are to be specified in Part 1, line 5.4, of the Medical Loss Ratio Reporting Form. The instructions state that this field is to contain "[a]ll expenses incurred by the issuer payable to a licensed agent, broker, or producer who is not an employee of the issuer in relation to the sale and solicitation of polices for the company."

57.     On December 2, 2011, CMS issued a press release stating that the MLR "provides unprecedented transparency and accountability of health insurance companies for customers" and provide "protection and value to approximately 74.8 million insured Americans."[8]

58.     In that same press release, CMS's Acting Administrator stated: "If your insurance company doesn't spend enough of your premium dollars on medical care or quality improvement this year, they'll have to give you rebates next year. This will bring costs down and give insurance companies the incentive to focus on what matters for patients – high quality health care."[9]

59.     Reinforcing the regulatory requirements and reporting instructions, on May 27, 2015, CMS issued CCIIO Technical Guidance (CCIIO 2015—0001).[10] The guidance stated:

---

[8] https://www.cms.gov/newsroom/press-releases/affordable-care-act-helping-consumers-get-better-value-their-health-care-dollars
[9] Id.
[10] https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/MLR-Guidance-Earned-Premium-and-APTC-Rebates-20150527.pdf. CMS guidance provides that if policyholders independently contract with an agent or broker, those fees may be excluded from the MLR, but only if seven specific conditions are *all* met. This guidance was issued in response to another type of industry scheme wherein issuers attempted to exclude agent and broker fees from their MLRs. The seven specific conditions are not met in this case.

COMPLAINT - 13
Civil Action No. _____

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA 98112
TELEPHONE: 206-860-2883

45 C.F.R. § 158.160(b)(2)(iv) requires issuers to report "Agents and brokers fees and commissions" as a non-claims cost (i.e., part of an issuer's administrative costs) because such fees and commissions are generally a condition of receiving coverage and an expense of the issuer not a separate cost incurred by the policy holder.

60.     As discussed in the CCIIO Technical Guidance, Question #65 posed to CMS asked: "How will CMS enforce the above guidance on earned premiums and the treatment of agent and broker fees and commissions?" CMS's answer was:

The Affordable Care Act and implementing regulations at 45 C.F.R. Part 158 require health insurance issuers to submit data on the proportion of premium revenues spent on clinical services and quality improvement, also known as the Medical Loss Ratio (MLR), in accordance with CMS guidance and instructions. Issuers are also required to issue rebates to enrollees if this percentage does not meet minimum standards. CMS will review issuer compliance with this guidance as part of its ongoing MLR monitoring efforts, including examination as part of an audit pursuant to 45 C.F.R. 158.402. If CMS determines that an issuer has incorrectly calculated rebates or has incorrectly reported MLR data, it may require issuers to take appropriate corrective actions, such as paying any difference in rebates owed (with interest) to enrollees, and reporting the corrected amounts to CMS.[11]

## V.    FACTUAL ALLEGATIONS

### A. Defendants' Fraudulent Conduct

#### 1. Defendants Falsely Registered Insurance Brokers on the Exchange as Providers

61.     Relator has been a licensed insurance broker since October 2000. Health insurance agents and brokers (at times referred to as "producers") act as middlemen to assist consumers and small employers in choosing and enrolling in health insurance products.

62.     Brokers may be self-employed, work for an independent agency or brokerage, work as "captive agents" that are direct employees of an insurance carrier, or work for banks and

---

[11] Id.

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

1   other companies within the financial services industry that have an insurance business segment.

2   Captive agents may also receive a salary, but all brokers generally are paid sales commissions by

3   insurers, which are set as a percentage of the premiums paid by the enrollee or policyholder.

4        63.    During his career, Relator has sold health insurance policies for various companies

5   through his brokerage company Cosme Services, LLC. Relator represents approximately 2,500

6   active health insurance members.

7        64.    Relator has sold health insurance plans on the ACA exchange and on state

8   exchanges since 2013.

9        65.    Relator began working with Defendants as a broker on October 30, 2015. In 2019,

10   Defendant Ambetter recognized Relator as a top producer for the State of Georgia and gave him

11   a trophy acknowledging his contributions.

12        66.    During Relator's employment with Defendants, he discovered they falsely

13   reported their expenditures on insurance broker fees and commissions and fraudulently inflated

14   their medical loss ratio—maximizing their own profit and avoiding required payments to CMS

15   and/or policyholders.

16        67.    Defendants paid brokers' commissions for selling their plans on the Exchange. For

17   each plan sold, brokers receive a commission from Defendants on a monthly basis. Commissions

18   are paid through direct deposit.

19        68.    On or about May 31, 2019, Defendants requested that Relator enroll for electronic

20   payment and direct deposit for his commissions and payments. However, Defendants asked him

21   to register as a "medical provider." Relator is not a medical provider, nor does he hold any

22   medical license.

23        69.    Defendants provided Relator, and other brokers, an ePayment Enrollment

24   Authorization Request form with Change Healthcare. Along with the form, Defendants provided

COMPLAINT - 15
Civil Action No. _____

SMITH & LOWNEY PLLC
2317 East John Street
Seattle, WA 98112
Telephone: 206-860-2883

1  an enrollment "tutorial" that included instructions to their brokers for them to register as

2  "medical providers." The tutorial directed brokers to check "Medical" as the provider type on the

3  enrollment form.

4        70.    The enrollment form also expressly states: "As required by 42 C.F.R. 455.18 and

5  455.19, I understand in accepting electronic payment that such payment may be from Federal

6  and State. Funds and any falsification or concealment of a material fact may be prosecuted under

7  Federal law."

8        71.    Believing this was wrong, as Relator has no medical license, Relator refused to

9  enroll as a "medical provider." Rather, he tried to be registered properly as a broker. Defendants

10  did not provide Relator any option to properly enroll as an insurance broker or agent.

11        72.    When Relator attempted to clarify with the company the reason for attempting to

12  sign him up as a "medical provider," Defendants' staff merely responded that this was the

13  normal process.

14        73.    Therefore, when Defendants calculated their MLR and submitted their required

15  MLR report, they falsely represented their insurance brokers as "medical providers" in order to

16  categorize those costs as healthcare services. This conduct is directly at odds with the statutory

17  and regulatory requirement that insurance broker fees and/or commissions be designated as

18  Administrative Costs. Defendants' misrepresentation of brokers as medical providers

19  necessitates the remittance of funds to CMS and/or represents amounts Defendants obtained and

20  retained because of their false claims and false statements.

21        74.    Moreover, if Healthcare Costs did not make up at least 85%, then insurers are

22  required to remit the balance to CMS. Defendants' conduct impacted its MLR because certain

23  costs were counted, and falsely reported, as Healthcare Costs, when they were actually

24  Administrative Costs.

*COMPLAINT* - 16
*Civil Action No.* _____

75.     Defendants are statutorily required to remit payments when they falsely designate Relator and other brokers as medical providers and when they do not meet MLR requirements. Withholding these funds wrongfully deprives the government of these funds and violates the reverse false claims provision of the FCA.

### 2. Defendants Reported Insurance Brokers' Fees and Commissions as Part of Healthcare Claims Instead of Administrative Costs

76.     In November 2020, Relator noticed a change in how he was being compensated. Relator discovered that his commissions from his sale of Medicare Advantage plans were being paid through Centene's subsidiary, WellCare.

77.     The payment description on those payments states: "Comprehensive He CO ENTRY DESCR: HCCLAIMPMT." "HCCLAIMPMT" means Healthcare Claim Payment.

78.     When Relator discovered his compensation had been changed to what he understood to be a "medical provider," despite his refusal to do this when asked, he asked some of his colleagues, who were also brokers for Defendants, how they were being paid.

79.     Relator learned that some other brokers had not refused Defendants' request to register as "medical providers." Relator has confirmed with colleagues that they have been receiving compensation from Defendants as "medical providers," in line with the tutorial Defendants provided for brokers to enroll for commission payments with Change Healthcare.[12]

80.     One colleague showed Relator a 2018 email that confirmed (a) Defendants' instruction that the colleague register as a "medical provider" to receive commission payments and (b) the colleague's compliance with that instruction.

---

[12] Relator knows the colleagues' names and can provide them during discovery.

COMPLAINT - 17
Civil Action No. _____

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

81.     From at least November 2020 through Relator's retaliatory termination, he received his commission payments as though he was a "medical provider." The chart below provides specific examples of payments by Defendants to Relator as Healthcare Costs.

| Date | Description | Amount |
|------|-------------|--------|
| 04/17/20 | Comprehensive He AP PAYMENT 1065687 ID: 1593547616 | $1,147.50 |
| 05/08/20 | Comprehensive He AP PAYMENT 1092657 ID: 1593547616 | $382.50 |
| 05/15/20 | Comprehensive He AP PAYMENT 1102594 ID: 1593547616 | $2,486.25 |
| 06/12/20 | Comprehensive He AP PAYMENT 1134802 ID: 1593547616 | $977.50 |
| 06/26/20 | Comprehensive He AP PAYMENT 1151187 ID: 1593547616 | $127.50 |
| 07/09/20 | Comprehensive HE AP PAYMENT ID: 1593547616 | $977.50 |
| 07/16/20 | Comprehensive He AP PAYMENT CTX ID: 1593547616 | $382.50 |
| 08/14/20 | Comprehensive He AP PAYMENT CTX ID: 1593547616 | $935.00 |
| 09/17/20 | Comprehensive He AP PAYMENT CTX ID: 1593547616 | $935.00 |
| 09/24/20 | Comprehensive He AP PAYMENT CTX ID: 1593547616 | $63.75 |
| 10/15/20 | Comprehensive He AP PAYMENT CTX ID: 1593547616 | $1,381.25 |
| 11/12/20 | Comprehensive He HCCLAIMPMT 2079940016248 CCD ID: 1593547616 | $935.00 |
| 12/17/20 | Comprehensive He HCCLAIMPMT 2079940016248 CCD ID: 1593547616 | $850.00 |
| 01/19/21 | Comprehensive He HCCLAIMPMT 2079940016248 CCD ID: 1593547616 | $7,794.75 |
| 02/11/21 | Comprehensive He HCCLAIMPMT 2079940016248 CCD ID: 1593547616 | $186.00 |
| 02/12/21 | Credit Centene Management Hcclaimpmt 9000004108 | $19,506.00 |
| 02/25/21 | Comprehensive He HCCLAIMPMT 2079940016248 CCD ID: 1593547616 | $1,260.00 |
| 03/10/21 | Credit Centene Management Hcclaimpmt 9000004108 | $18,768.00 |
| 03/25/21 | Comprehensive He HCCLAIMPMT 2079940016248 CCD ID: 1593547616 | $1,730.66 |
| 04/08/21 | Comprehensive He HCCLAIMPMT 2079940016248 CCD ID: 1593547616 | $202.50 |
| 04/20/21 | Comprehensive He CO ENTRY DESCR:HCCLAIMPMT SEC: CCD IND ID 2079940016248 ORIG ID:1593547616 | $102.50 |

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

82.     As illustrated in the chart above, in just five months, Relator received more than $50,000 in commission payments that Defendants were categorizing as Healthcare Costs to a "medical provider," when Relator was and is actually an insurance broker.

83.     As discussed above, commission payments to brokers do not qualify as Healthcare Costs. Instead, Defendants are statutorily required to categorize these payments as Administrative Costs.

84.     The chart above indicates that Defendants submitted payments for broker commissions as Healthcare Costs. Reporting commission payments as Healthcare Costs reduces the amount of administrative expenses reported in Defendants' MLR. Specifically, in only the 10 representative false claims noted in the above chart, Defendants falsely reported over $50,000 of prohibited brokers' commissions as Healthcare Costs.

85.     Defendants employ thousands of brokers across the United States.

86.     Defendants' fraudulent conduct allowed them to falsely represent that they met the MLR requirements set by the ACA and to avoid remittance of payments to CMS and/or policyholders that would have been required if their broker fees and commissions were appropriately calculated as administrative expenses in Defendants' MLR.

### 3. Defendants Reported Unspent Credits in Ambetter's My Health Pays Rewards Program as Part of Healthcare Claims

87.     Defendants used a beneficiary credit program to manipulate their MLR reporting.

88.     Defendants, through Defendant Ambetter, operate a rewards program to incentivize healthier activities and to encourage beneficiaries to seek preventative healthcare services. The program is called My Health Pays Rewards Program.

89.     As a part of this program, Defendant Ambetter provides its subscribers with credits that they can use towards any balance they incur as a part of their healthcare plan.

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

90.     While working with a beneficiary in October 2020, Relator learned of inconsistencies involving Defendants' administration of the My Health Pays Rewards Program.[13]

91.     Relator discovered inconsistencies in balances through which Defendant Ambetter would credit subscribers for a given amount, and later report that credit as being spent, despite the fact the subscriber had not accessed any healthcare service that would use the credit.

92.     Upon information and belief, to the extent that Defendants reported this spending as a part of their Healthcare Costs, this conduct artificially inflated their MLR and avoided remittance to CMS and/or policyholders.

**B. Defendants Retaliated Against Relator**

93.     As a result of Relator's attempts to alert Defendants that paying brokers as "medical providers" was illegal, Defendants retaliated against him by withholding payment of his commissions, stonewalling him when he tried to resolve the payment issues, taking his clients by reassigning them to other brokers, and ultimately terminating the entirety of his contract with Defendants.

94.     When Relator was first asked to register as a "medical provider" in order to receive commission payments, he refused, believing it was a violation of MLR requirements. Instead, Relator attempted to to be registered properly as an insurance broker.

95.     When Relator brought the improprieties to Defendants' attention, the company merely repeated the instruction that Relator would need to register himself as a "medical provider." Defendants did not provide Relator any option to properly enroll as an insurance broker or agent.

---

[13] Relator knows the beneficiary's name and can provide it during discovery.

*COMPLAINT* - 20
*Civil Action No.* _____

SMITH & LOWNEY PLLC
2317 East John Street
Seattle, WA  98112
Telephone: 206-860-2883

96.     Specifically, Relator brought his concerns about Defendants' fraudulent conduct directly to K.T., Relator's sales manager at the time.[14] K.T. responded by pushing him to register as a "medical provider," reassuring him that this was the "right way." Relator refused. Relator continued to receive payment by check from Defendants.

97.     Relator also reached out directly to the electronic payment vendor, Change Healthcare, and clarified that he was not a medical provider, but a broker. He informed them the registration documents did not have an option for registering as a broker. He was told "this is the new process moving forward" or words to that effect.

98.     Relator continued to refuse to register as a "medical provider," believing it violated MLR requirements. Defendants responded to his refusal by withholding more than $40,000 in compensation owed to Relator over several months.

99.     In further retaliation, Defendants allowed competing brokerages, such as Messer Financial Group, Inc. (Messer), a North Carolina field marketing organization, to extract Relator's client data and share it with competing agents like A.B. in order to acquire Relator's member base without consent or compensation.[15]

100.    A.B., an associate agent for Messer, converted to himself/herself a significant number of health insurance members registered under Relator as the "Agent of Record." This significantly reduced Relator's compensation because the contracting companies keep track of commissions owed based on who is listed as the Agent of Record for each particular member.

101.    Relator was told by S.S., another broker and a regional sales director working for Defendants, that Defendant Ambetter knew Messer was extracting plan information related to Relator and was sharing it with competing agents, like A.B.[16] Relator attempted rectify the

---

[14] Relator knows K.T.'s name and can provide it during discovery.
[15] Relator knows A.B.'s name and can provide it during discovery.
[16] Relator knows S.S.'s name and can provide it during discovery.

*COMPLAINT* - 21
*Civil Action No.* _____

1   situation, but instead, and in further retaliation, Defendants underreported to investigators the

2   amount of commission owed to Relator.

3       102.   In another act of retaliation for Relator's reporting of Defendants' fraudulent

4   conduct and continued refusal to participate, Defendants withheld Relator's ability to renew

5   contracts—thereby constructively terminating Relator's contract.

6       103.   Despite Defendants' recognition of Relator as a top producer, they withheld the

7   option to renew his contract—an opportunity that was extended to every other producer that

8   subcontracted with the company. The primary, if not the sole, reason for withholding this option

9   was that Relator raised concerns about Defendants' fraudulent conduct.

10      104.   On October 1, 2021, Defendant Ambetter sent Relator a letter dated September 30,

11  2021, notifying him that his appointments to sell Ambetter-branded products in Florida, Georgia,

12  North Carolina, Pennsylvania, Tennessee, and Texas would terminate effective October 30,

13  2021, and the applicable contracts with Celtic Insurance Company, Ambetter of Peach State Inc.,

14  Ambetter of North Carolina Inc., and Pennsylvania Health and Wellness Inc., would also

15  terminate effective October 30, 2021.

16      105.   This termination letter represented that Relator would continue to receive

17  commissions on all his in-force business as long as his licenses remained active. However, as

18  discussed above, Defendants were actively siphoning off Relator's business and, therefore,

19  commissions Defendants should have paid him.

20      106.   Defendants are well aware that the concerns Relator raised violate MLR

21  requirements. CMS issued many memoranda related to the MLR requirements and addressed

22  them to "all health insurance issuers," like Defendants.

23      107.   Moreover, as noted above, Defendant WellCare was named as a defendant in a

24  series of FCA lawsuits related to inflated billings, among other allegations.

*COMPLAINT* - 22
*Civil Action No.* _____

1    108.   The lawsuits alleged a number of schemes to submit false claims to Medicare and

2  various Medicaid programs, including allegations that WellCare falsely inflated the amount it

3  claimed to be spending on medical care in order to avoid returning money to Medicaid and other

4  programs in various states, including the Florida Medicaid and Florida Healthy Kids programs;

5  knowingly retained overpayments it had received from Florida Medicaid for infant care; and

6  falsified data that misrepresented the medical conditions of patients and the treatments they

7  received.

8    109.   In April 2012, to resolve those lawsuits, WellCare agreed to pay $137.5 million to

9  the United States and nine states.

10    110.   In announcing the settlement, the United States Attorney for the Middle District of

11  Florida stated: "In an era of decreasing federal and state budgets, and increasing healthcare costs,

12  we must pursue all available civil remedies to recover losses suffered by government healthcare

13  programs. This settlement should serve as notice to those defrauding state and federal healthcare

14  programs that, in addition to appropriate criminal prosecutions, we will utilize civil suits to root

15  out their conduct and recover their ill-gotten gains."

16    111.   The Acting Assistant Attorney General for the Justice Department's Civil Division

17  added: "Government health plans increasingly rely on managed care organizations to provide

18  patient care. This case illustrates our commitment to ensure that government funds are in fact

19  used to render care and not to line the pockets of those more concerned with the bottom line."

20    112.   When Relator engaged in protected activities, including reporting his concerns and

21  refusing to register as a "medical provider," to prevent violations of the MLR requirements,

22  Defendants responded by discriminating against him because of those activities by withholding

23  payment of his commissions, stonewalling him when he tried to resolve the payment issues,

24

COMPLAINT - 23
Civil Action No. _____

1  taking his clients by reassigning them to other brokers, and ultimately terminating the entirety of

2  his contract.

3         113.   As a direct result of Defendants' retaliatory conduct, Relator has been significantly

4  damaged.

5  **VI.     CONCLUSION**

6         114.   The Government Accountability Office found that if broker commissions and fees

7  were excluded from the MLR calculation, ACA MLR remittances would have been

8  approximately 75% lower on average.

9         115.   Insurance brokers fees and commissions must be properly included in the MLR

10  calculation as Administrative Costs – not Healthcare Costs.

11        116.   Defendants falsely stated their brokers were "medical providers" and falsely

12  submitted costs related to those services as Healthcare Costs, rather than properly as non-claim

13  administrative costs. Because of Defendants' fraudulent conduct, the Government has been, and

14  continues to be, harmed.

15  **VII.    COUNTS**

16  

**COUNT I**
**FCA: Presentation of False Claims**

17  

**(31 U.S.C. § 3729(a)(1)(A))**

18        117.   Relator realleges and incorporates by reference the allegations in paragraphs 1

19  through 116.

20        118.   This is a claim for treble damages and penalties under the FCA.

21        119.   Through the acts described above and otherwise, Defendants, in reckless disregard

22  or deliberate ignorance of the truth or falsity of the information involved, or with actual

23  knowledge of the falsity of the information, presented or caused to be presented to the

24

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

1  Government materially false or fraudulent claims for payment or approval in violation of 31

2  U.S.C. § 3729(a)(1)(A).

3      120.   The Government was unaware of the falsity or fraudulence of the records,

4  statements, and claims made or presented by Defendants, their agents, and employees.

5      121.   The false and fraudulent representations and claims Defendants knowingly made

6  or caused to be made to the United States were material to the United States' decisions to make

7  payments to Defendants.

8      122.   Had the United States actually known of the false or fraudulent nature of

9  Defendants' representations and claims, it would have been prohibited by law from making

10  corresponding payments to Defendants.

11      123.   Though Relator can identify some of the false claims that Defendants presented or

12  caused to be presented, Relator cannot identify all such false claims because Relator does not

13  have access to all the records in Defendants' possession.

14      124.   By reason of the Defendants' acts, the Government has been damaged, and

15  continues to be damaged, in a substantial amount yet to be determined.

16      125.   The Government is also entitled to the maximum penalty under 31 U.S.C. §

17  3729(a)(1)(A) for each and every violation alleged herein.

18              **<u>COUNT II</u>**
    **<u>FCA: Using False Statements to Get False Claims Paid</u>**
19          **<u>(31 U.S.C. § 3729(a)(1)(B))</u>**

20      126.   Relator realleges and incorporates by reference the allegations in paragraphs 1

21  through 116.

22      127.   This is a claim for treble damages and penalties under the FCA.

23      128.   Through the acts described above, Defendants, in reckless disregard or deliberate

24  ignorance of the truth or falsity of the information involved, or with actual knowledge of the

*COMPLAINT* - 25
*Civil Action No.* _____

1  falsity of the information, made, used, or caused to be made or used false records or statements

2  material to the payment of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

3     129.   Defendants' false certifications and representations were made for the purpose of

4  ensuring that the United States paid the false or fraudulent claims, which was a reasonable and

5  foreseeable consequence of Defendants' statements and actions.

6     130.   The Government was unaware of the falsity of the records, claims, or statements

7  made or used by Defendants, their agents, and employees.

8     131.   The false and fraudulent representations and claims Defendants knowingly made

9  to the United States were material to the United States' decisions to make payments to

10 Defendants.

11    132.   Had the United States actually known of the false or fraudulent nature of

12 Defendants' representations and claims, it would have been prohibited by law from making

13 corresponding payments to Defendants.

14    133.   By reason of the Defendants' acts, the Government has been damaged, and

15 continues to be damaged, in a substantial amount yet to be determined.

16    134.   The Government is also entitled to the maximum penalty under 31 U.S.C. §

17 3729(a)(1)(B) for each and every violation alleged herein.

18                              **COUNT III**
                  **FCA: False Record Material to Obligation to Pay**
19                        **(31 U.S.C. § 3729(a)(1)(G))**

20    135.   Relator realleges and incorporates by reference the allegations in paragraphs 1

21 through 116.

22    136.   This is a claim for treble damages and penalties under the FCA.

23    137.   Through the acts described above, Defendants knowingly made, used, or caused to

24 be made or used false records or statements material to an obligation to pay or transmit money to

*COMPLAINT* - 26
*Civil Action No.* _____

SMITH & LOWNEY PLLC
2317 East John Street
Seattle, WA  98112
Telephone: 206-860-2883

1  the Government or knowingly and improperly concealed, avoided, or decreased an obligation to

2  pay or transmit money to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

3      138.   Defendants avoided rebates and or remittance payments by falsifying reporting

4  their Medical Loss Ratio.

5      139.   The Government was unaware of the falsity of the records, statements, and claims

6  made or submitted by Defendants.

7      140.   The false and fraudulent representations and claims Defendants knowingly made

8  to the United States were material to the Government's decisions to make payments to

9  Defendants and deprived the United States of money Defendants were obligated to pay to the

10  United States.

11      141.   By knowing they obtained and retained federal funds to which they were not

12  entitled, and by failing to self-disclose the misconduct to the United States or to remit the

13  excessively retained amounts, Defendants violated 31 U.S.C. § 3729(a)(1)(G).

14      142.   By reason of the Defendants' acts, the Government has been damaged, and

15  continues to be damaged, in a substantial amount yet to be determined.

16      143.   The Government is also entitled to the maximum penalty under 31 U.S.C. §

17  3729(a)(1)(G) for each and every violation alleged herein.

18  **COUNT IV**
**Retaliation in Violation of the False Claims Act**

19  **(31 U.S.C. § 3730(h))**

20      144.   Relator realleges and incorporates by reference the allegations in paragraphs 1

21  through 116.

22      145.   Relator, as an independent contractor for Defendants, is protected from retaliation

23  under 31 U.S.C. § 3730(h)(1).

24

COMPLAINT - 27
Civil Action No. _____

SMITH & LOWNEY PLLC
2317 East John Street
Seattle, WA 98112
Telephone: 206-860-2883

146.   Shortly before his termination, Cosme engaged in protected conduct as that term is defined by the FCA and other statutes, rules, codes, and other protections.

147.   Defendants unlawfully discriminated against and discharged Cosme in retaliation for lawful acts he took on behalf of the United States and the general public in furtherance of an action under this section or other efforts to stop one or more violations of the FCA. Defendants violated 31 U.S.C. § 3730(h) when they retaliated against Cosme for exercising his rights under the FCA.

148.   As a result of his protected conduct, Defendants terminated Cosme on September 30, 2021, when he was notified Defendants would be terminating his contract. In 2019, Defendant Ambetter recognized Cosme as a top producer in the State of Georgia, and there was no reason for his termination other than retaliatory animus towards Cosme for his protected conduct.

149.   Defendants' retaliatory conduct violates the FCA and other statutes, rules, codes, or other protections.

150.   As a direct result of Defendants' unlawful retaliatory conduct and termination, Cosme has been damaged for which he is entitled to all relief necessary to make him whole, including reinstatement, two times the amount of backpay, and compensation for any special damages, under 31 U.S.C. § 3730(h)(1) and (2).

**PRAYER FOR RELIEF**

WHEREFORE, Relator respectfully requests that this Court:

A. Enter judgment for the United States Government and Relator, and against Defendants jointly and severally;

B. Award treble damages, in an amount to be determined at trial, plus the maximum statutory penalty for each claim in violation of the FCA;

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA  98112
TELEPHONE: 206-860-2883

C.  Award the United States Government damages against Defendants as required by law for Defendants' violations of the FCA;

D.  Assess civil penalties against Defendants as required by law for their false statements and false claims, including those under 31 U.S.C § 3729(a)(1) and 42 U.S.C. § 18033(6);

E.  Award Relator an appropriate relator's share, in an amount to be agreed upon by the government and Relator or, if no agreement can be reached, by the Court, pursuant to 31 U.S.C. § 3730(d), of the proceeds or settlement of any alternate remedy, including related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, penalties, liquidation, restitution, or disgorgement to the United States, and/or third parties;

F.  Award prejudgment interest;

G.  Award Relator statutory attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

H.  Award Cosme, with respect to his federal retaliation claims:

    a.  Reinstatement of his contracts to provide Ambetter-insurance products;

    b.  Two times the amounts of back pay, including commissions, that he would have had but for the retaliation;

    c.  Interest on the back pay and commissions;

    d.  Compensation for all special damages, including commissions and emotional distress, sustained as a result of the retaliation and discharge, in an amount to be determined at trial;

    e.  Front pay and future lost commissions in an amount to be determined at trial;

    f.  Litigation costs and reasonable attorneys' fees.

SMITH & LOWNEY PLLC
2317 EAST JOHN STREET
SEATTLE, WA 98112
TELEPHONE: 206-860-2883

1    I.   Award all other applicable consequential, incidental, nominal, and expectation

2         damages;

3    J.   Order Defendants to cease and desist from violating the FCA; and

4    K.   Grant such other relief as the Court may deem just, necessary, and proper.

5

6    **PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE JURY IS**

7    **AVAILABLE.**

8                                        Respectfully submitted:

9    Dated: November 12, 2021            SMITH & LOWNEY PLLC

10

11   _Meredith A. Crafton_
     Meredith A. Crafton, WSBA #46558

12

13   _Meredith A. Crafton For Richard A. Smith_
     Richard A. Smith, WSBA #21788

14   2317 East John Street
     Seattle, WA 98112

15   Telephone: (206) 860-2883
     Facsimile: (206) 860-4187

16   richard@smithandlowney.com

17   Lon R. Leavitt* (AZ Atty No. 35825)
     HALUNEN LAW

18   Two North Central Avenue, Suite 1800
     Phoenix, Arizona 85004

19   Telephone: (602) 254-6494
     Facsimile: (612) 605-4099

20   leavitt@halunenlaw.com

21   Nathaniel F. Smith* (MN Atty No. 397276)
     HALUNEN LAW

22   80 South Eighth Street, Suite 1650
     Minneapolis, MN 55402

23   Telephone: (612) 605-4098
     Facsimile: (612) 605-4099

24   smith@halunenlaw.com

*COMPLAINT* - 30
*Civil Action No.* _____

1

2          Mike Bothwell* (GA Atty No. 069920)
           BOTHWELL LAW GROUP
3          304 Macy Drive
           Roswell, GA 30076
           Telephone: (770) 643-1606
4          Facsimile: (770) 643-1442
           mike@whistleblowerlaw.com
5
           * *Pro hac vice* applications to be filed pursuant to
6             LCR 83.1(d).

7          *ATTORNEYS FOR RELATOR GERARDO COSME*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*COMPLAINT* - 31
*Civil Action No.* _____